[Cite as *Carr v. Acacia Country Club Co.*, 2012-Ohio-1940.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**Nos. 96731 and 96732**

**LEONARD F. CARR**

PLAINTIFF-APPELLEE

vs.

**ACACIA COUNTRY CLUB CO., ET AL.**

DEFENDANTS-APPELLEES

**Appeal By Acacia Development Company, Ltd.**

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case Nos. CV-682363 and CV-635329

**BEFORE:** Celebrezze, J., Stewart, P.J., and S. Gallagher, J.

**RELEASED AND JOURNALIZED:** May 3, 2012

**ATTORNEYS FOR APPELLANT**
**Acacia Development Company**
Scott H. Kahn
Mark F. Kruse
McIntyre, Kahn & Kruse Co., L.P.A.
Galleria & Tower at Erieview
1301 East Ninth Street
Suite 2200
Cleveland, Ohio   44114


**ATTORNEYS FOR APPELLEES**

**For Leonard F. Carr**

William F. Scully, Jr.
Williams, Moliterno & Scully Co., L.P.A.
2241 Pinnacle Parkway
Twinsburg, Ohio   44087

Robert P. DeMarco
Joseph J. Triscaro
DeMarco & Triscaro, Ltd.
30505 Bainbridge Road
Suite 225
Solon, Ohio   44139

**For Acacia Country Club Company**

Timothy J. Fitzgerald
Colleen A. Mountcastle
Matthew T. Norman
Mark M. Turner
Alton L. Stephens
Gallagher Sharp
6th Floor, Bulkley Building
1501 Euclid Avenue
Cleveland, Ohio   44115

Andrew A. Kabat
Jennifer K. Rinkes
Haber Polk Kabat, L.L.P.
737 Bolivar Road

-continued-

Suite 4400
Cleveland, Ohio   44115

**For Westfield Insurance Company**

Richard M. Garner
Roni R. Sokol
Davis & Young
1200 Fifth Third Center
600 Superior Avenue, East
Cleveland, Ohio   44114

FRANK D. CELEBREZZE, JR., J.:

{¶1} Appellant, Acacia Development Co., Ltd. (the "Developer"), brings the present appeal from the grant of summary judgment in favor of appellee, the Acacia Country Club Co. (the "Club"), on appellant's claims of breach of contract, breach of joint venture agreement,[1] negligence, negligent misrepresentation, rescission, unjust enrichment, equitable estoppel, and declaratory judgment stemming from the sale of real estate from the Club to the Developer. After a thorough review of the record and law, we affirm.

{¶2} In 2003, the Club decided it needed to update its clubhouse in order to attract and retain new members. In an effort to raise capital and secure financing, the Club decided to sell a piece of its unused real estate to partially finance the construction of a new clubhouse. The original potential buyer and the Club could not reach an agreement, and a Club member and former director who had helped negotiate the deal stepped in and offered to purchase the property. In 2005, the Developer, through representative Joseph Aveni, agreed to purchase 17.9897 acres of land with an additional easement on 6.4 acres for $4,000,000. In 2003, the Club had authorization through a shareholder vote to sell only 16 acres of land and the authority to do whatever was necessary to effectuate the sale of 16 acres of land.

{¶3} Upset with the sale, a member of the Club, Leonard Carr, filed a shareholder derivative suit on behalf of the Club against its directors.[2] The suit also named the Developer as

---

[1] This cause of action was previously disposed of via summary judgment in a separate motion on February 8, 2010, and is not being appealed here.

[2] A second suit was later filed that named the Developer as a defendant. These cases, while never formally consolidated below, were handled together because they were related.

a party. The Developer cross-claimed against the Club with the above-stated causes of action, seeking to rescind the sale and for the return of the purchase price plus approximately $8,000,000 in out-of-pocket expenses incurred in the development of the land for sale as residential lots. Summary judgment was granted in the Club's favor regarding Carr's derivative suit. The remaining claims were the Developer's against the Club.

{¶4} The Developer and the Club filed cross-motions for summary judgment. The trial court allowed extensive briefing and subsequently granted the Club's motion in a lengthy opinion.

{¶5} The Developer appeals, raising two assignments of error:

I. The Trial Court erred in its Journal Entry of April 1, 2011, granting summary judgment in favor of [the Club], and denying summary judgment in favor of [the Developer], and thereby ruling that appellant [the Developer] received marketable title to approximately 17.9897 acres of real estate, and that [the Club] had "transferred a marketable title with no clouds."

II. The trial court erred by finding as a matter of law that appellant [the Developer] was not proximately damaged even if there was an unmarketable title, and did not have standing to make a claim even if there was an unmarketable title, as the cloud on title was "not caused by [the Club's] failure to abide by the code of regulations but by Carr's conduct, including his lawsuit," when said lawsuit was a derivative action brought by Carr, a shareholder of [the Club] "acting on behalf of and for the benefit of [the Club]."

{¶6} Upon thorough review of the record, applicable law, and the decision of the trial court, we find the trial court's consideration of the facts and application of pertinent law to be correct. The trial court's thorough analysis of the issues makes a lengthy opinion by this court duplicitous and unnecessary because this court's judgment is the same as the court's below. We

therefore adopt the well-reasoned decision of the trial court, journalized April 1, 2011, as our own.[3]   We find appellant's assigned errors not well taken.

**{¶7}** Judgment affirmed.

It is ordered that appellees recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


FRANK D. CELEBREZZE, JR., JUDGE

MELODY J. STEWART, P.J., and
SEAN C. GALLAGHER, J., CONCUR

**APPENDIX**

**IN THE COURT OF COMMON PLEAS**
**CUYAHOGA COUNTY, OHIO**

| | | |
|---|---|---|
| **LEONARD F. CARR** | ) | **JUDGE JOHN P. O'DONNELL** |
| | ) | |
| | ) | **CASE NO. CV 07 635329** |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **ACACIA COUNTRY CLUB** | ) | |
| **COMPANY, et al.** | ) | |
| | ) | |

---

[3] Cuyahoga County Common Pleas Court Journal Entry dated April 1, 2011, is included in the appendix to this opinion.  We have edited the trial court's opinion for the sole purpose of correcting any obvious typographical errors and including paragraph numbers.   In all other respects, the trial court's opinion remains in its original form.

**LEONARD F. CARR** )
                           )
                           )       **CASE NO. CV 09 682363**
                           )
               **Plaintiff,** )
                           )
            **vs.** )
                           )
**ACACIA COUNTRY CLUB** )
**COMPANY, et al.** )
                           )
            **Defendants.** )      <u>**JOURNAL ENTRY**</u>

*John P. O'Donnell, J.*:

<u>STATEMENT OF THE CASE</u>
CASE NO. CV 07 635329

**{¶8}** This lawsuit began with a complaint by Leonard F. Carr against, among others, the Acacia Country Club Company[1] and the Acacia Development Company, LLC.[2] Carr's claims were decided by summary judgment, but ADC's cross-claims against Acacia remain pending.

**{¶9}** ADC and Acacia have each now moved for summary judgment on ADC's claims.

CASE NO. CV 09 682363

**{¶10}** Leonard F. Carr filed this case against Acacia and its directors. His claims were decided in the defendants' favor by summary judgment, but ADC intervened in the lawsuit and its intervenor's cross-claim against Acacia is pending. ADC and Acacia have separately moved for summary judgment on the intervenor's cross-claim.

**{¶11}** Although the cases have not been consolidated, in deciding the pending motions for summary judgment the court has considered all relevant briefs and evidentiary materials filed in each case.

---

[1] Referred to throughout this entry as Acacia.

ACACIA DEVELOPMENT COMPANY, LLC'S CLAIMS

CASE NO. CV 07 635329

**{¶12}** ADC's affirmative claims against Acacia in case number 635329 were asserted as a cross-claim filed January 31, 2008.[3]   Included in that cross-claim are causes of action for:

·        Count One – Breach of Contract
·        Count Two – Breach of Joint Venture Agreement
·        Count Three – Negligence and Negligent Misrepresentation
·        Count Four – Rescission
·        Count Five – Unjust Enrichment
·        Count Six – Equitable Estoppel
·        Count Seven – Declaratory Judgment

**{¶13}** Summary judgment in Acacia's favor on the claim for breach of a joint venture agreement was granted.[4]   The other six causes of action are still pending.

CASE NO. CV 09 682363

**{¶14}** ADC's affirmative claim against Acacia in case number 682363 is set forth as a cross-claim filed March 24, 2009.[5]   That pleading sets forth a cause of action for declaratory judgment.   ADC seeks a declaration of the parties' rights and obligations under a first amended and restated purchase agreement and easement covering the sale of some of Acacia's land to ADC.

STATEMENT OF FACTS

Case Number CV 07 635329 Pleadings

**{¶15}** On August 19, 2005, Acacia and ADC signed a contract where ADC agreed to buy about 18 acres of Acacia's land for $4,000,000 and Acacia agreed to grant certain easements on

---

[2]Referred to throughout this entry as ADC.

[3]Defendant Acacia Development Company, LLC's amended answer to first amended verified complaint, counterclaim, and cross-claim, pages 18-37.

[4] See journal entry of 02/08/2010.

its remaining property to ADC. ADC intended to use the land for a housing development and began to improve the land and seek out buyers, eventually getting 17 lot reservations and several deposits for purchase.

{¶16} Around the same time, Carr — a member and shareholder of Acacia — brought an unsolicited offer from a buyer to purchase all of Acacia for $22,000,000. Acacia's membership rejected that offer, but ADC alleges that the uncertainty it created about Acacia's future killed the momentum of ADC's development because part of the development's attraction was proximity and access to Acacia's golf course.

{¶17} Then, in September 2007, Carr filed case number 635329 as a shareholders' derivative lawsuit against the company's directors individually pursuant to Rule 23.1 of the Ohio Rules of Civil Procedure. The complaint alleged, among other things, that Acacia, in entering into the contract with ADC, exceeded the authority granted by its shareholders in a July 2003 resolution because that resolution approved the sale of no more than 16 acres for a net of not less than $4,000,000 and did not give Acacia the authority to encumber its remaining real estate with a scenic easement. Based on Carr's allegations, ADC claims that Acacia did not have authority to enter into the contract. ADC seeks to rescind the contract and recover damages.

The Acacia Country Club

{¶18} The Acacia Country Club Company is a golf country club at 26899 Cedar Road in Lyndhurst. It has been in operation since 1921. Acacia is formed as an Ohio non-profit corporation and is governed by a code of regulations. The code of regulations includes the following provisions relevant to these cases:

CODE OF REGULATIONS

---

[5] Intervenor's answer and cross-claim, pages 6-9.

ACACIA COUNTRY CLUB COMPANY

***
ARTICLE I

***

Section 3. NOTICE:  A written or printed notice of . . . any special meeting of shareholders, stating the time and place and objects and purposes thereof, shall be mailed to each shareholder   . . . at least twenty (20) days before any meeting . . .

***

Section 6. VOTING BY PROXY:  Any shareholder entitled to a vote at a meeting of the shareholders may . . . vote . . . by proxy . . . submitted to the Secretary at or before such meeting.  The shareholder may indicate upon such proxy how their vote shall be cast . . . upon any question before the meeting.

***

ARTICLE II
DIRECTORS

***

Section 2. POWERS:  The Board of Directors shall have entire control and management of the affairs and property of the company, subject to such orders and resolutions as may from time to time be adopted by the shareholders . . . The Board of Directors shall have the power to sell or trade minor portions of the company property when such sale or trade shall benefit the use of the company.

***

The Board shall control . . . Purchasing and/or the awarding of contracts . . .

The Board of Directors shall not have power to mortgage or voluntarily encumber any real property owned by the company unless such action shall have been approved by the majority of shares outstanding.

***

The code of regulations is otherwise silent about the authority of the board to sell the company's property.

Most of the country club's members are also shareholders of the corporation. After eight decades of existence, the club's membership had decreased and its facilities, particularly the clubhouse, were outdated. The board of directors considered selling Acacia's assets as a solution to the company's decline. However, the shareholders rejected two offers by Carr clients to buy the assets.

{¶19} Then, in May 2003, the board of directors decided to tear down the old clubhouse and build a new one. To finance the new construction the board recommended selling some land and mortgaging the rest as collateral for a loan. The board, on May 22, 2003, resolved that:

RESOLUTION

\*\*\*

*Whereas*, the Members of Acacia have expressed their wish to preserve a long tradition of friendly association in a private social club setting, and

*Whereas*, . . . upgraded facilities are needed to serve the needs of existing Members as well as attract new Members, and

\*\*\*

*Now Therefore*: The Board of Directors unanimously recommends that Acacia Members vote in favor of the Resolution to proceed with the sale of 16 acres of land and the construction of new clubhouse facilities as set forth in the Resolution before the Acacia Shareholders.

{¶20} The exact dimensions of the land to be sold were not surveyed before the resolution was put to a vote by the shareholders. The shareholder meeting to vote on the resolution was held on July 1, 2003. The members approved the following resolution:[6]

---

[6] Some copies of the resolution and proxy refer to the sale of "16 acres of land" and other

. . . the Board of Directors of the Company and the officers of the Company are hereby authorized and directed to execute and deliver agreements and to take all other action required to implement the following:

> The design and construction of a new clubhouse containing approximately 28,000 square feet to be located to the immediate east of the existing clubhouse at a total cost of Acacia not to exceed $8,000,000;

> To sell 16 acres of land located in the northeast section of the Acacia property as depicted on Exhibit B attached hereto and made a part hereof for a price of not less than $4,000,000, which proceeds shall be applied to the cost of designing and constructing the new clubhouse;

> To place a mortgage on the Acacia real estate in an amount not to exceed $4,000,000 with an amortization schedule and interest rate and balloon payment date as favorable as possible to Acacia to be repaid by a monthly assessment of the existing and new Acacia members and from the initiation fees paid by new members; the proceeds of the mortgage shall be used to pay for the design and construction of the new clubhouse.

**{¶21}** After getting this approval, the board continued negotiations to sell the land to developer Donald L. Barr & Co. During these negotiations it became apparent that a scenic easement, or "buffer zone," would have to be made on the golf course property between the course and the development. Ultimately, Barr & Co. did not buy the land and Joseph Aveni's company, ADC, became the buyer.

### Acacia's Sale of Land to ADC

**{¶22}** Joseph T. Aveni is a real estate developer and a member and former director of Acacia. He is an officer of Acacia Development Company, LLC. On August 19, 2005, he

---

copies of the resolution and ballot refer to "approximately 16 acres of land." Because the exact language approved is uncertain, the court, on summary judgment, will assume that the version actually voted on is the one most favorable to the party claiming the resolution was ineffective, *i.e.* the version referring to "16 acres of land."

executed on behalf of ADC the first amended and restated agreement of purchase and sale of 17.9897 acres of Acacia's land.   That contract provides:

FIRST AMENDED AND RESTATED AGREEMENT
OF PURCHASE AND SALE

\*\*\*

Section 1 – The Property

Seller agrees . . . to sell and convey to Purchaser, and Purchaser agrees to purchase and acquire from Seller . . .

A.      the real property located in the City of Lyndhurst, County of Cuyahoga, and State of Ohio, consisting of 17.9897 acres . . .

B.      the Property shall also include the following easements . . .

   i.      an easement over a portion of Seller's property near the 17th tee . . .for off-site drainage . . .
   ii.     the Scenic Easement (as defined in Section 6(G) below), subject to the terms of Section 6(G) below.

\*\*\*

Section 2 – Purchase Price

The purchase price to be paid by Purchaser to Seller for the Property is Four Million and 00/100 Dollars ($4,000,000.00) . . .

\*\*\*

Section 3 – Title

A.      Seller shall convey good and marketable, indefeasible fee simple title to the Property to Purchaser . . . free and clear of all defects, encumbrances, mortgages, reservations, liens, and clouds on title except . . . permitted exceptions . . .

\*\*\*

I.      Notwithstanding any provision herein to the contrary, if any of the obligations imposed on Seller by this Agreement require resubmission to Seller's members for approval (e.g. reducing the net sales proceeds to Seller below $4,000,000), such approval shall

be a condition to Seller's obligations hereunder.   Purchaser acknowledges and agrees that the current approval of Seller's shareholders and board of directors to enter into this transaction is expressly conditioned upon Seller receiving net proceeds of not less than $4,000,000 from the sale after all expenses of any kind.

\*\*\*

Section 8 – Seller's Representations and Warranties

Seller represents, warrants and covenants to Purchaser as follows:

A.   Seller is a corporation duly organized and validly existing under the laws of the State of Ohio.  Seller and the party signing this Agreement on its behalf have full power, authority and legal rights to enter into this Agreement;

\*\*\*

C.   The execution and delivery of this Agreement and performance thereunder by the Seller will not conflict with or result in a violation of, or breach of. . . any. . . other agreement or instrument to which Seller is a party.

\*\*\*

**{¶23}** ADC paid the four million dollars and Acacia transferred title to the property by a deed executed on August 19 and recorded on August 22, 2005.  The caption of the legal description attached as an exhibit to the deed describes the property as being "a 17.9919 acre parcel."  Acacia used the money from the sale to build the new clubhouse and ADC began to develop its property.

**{¶24}** Two years later, on September 11, 2007, Carr filed the complaint in case number 635329.  The primary defendants in 635329 were Acacia's individual directors.  The gist of Carr's claims is that the directors: 1) exceeded their authority under the resolution authorizing the sale of "16 acres" of land by selling 17.9897 acres; 2) violated the prohibition in the code of regulations against encumbering land without shareholder approval by granting ADC a scenic

easement; and 3) exceeded their authority under the resolution by approving a sale that netted Acacia less than $4,000,000. The lawsuit included Joseph Aveni as an individual defendant on claims of fraud (for not disclosing to Acacia's members details of the land sale) and civil conspiracy. Carr also named Acacia Development Company, LLC as a defendant — for reasons that are still inscrutable — precipitating ADC's seven-count cross-claim against Acacia.

ADC's claims in 635329

Cross-claim count one: Breach of Contract

{¶25} By the first count of its cross-claim, ADC claims that Acacia, by selling 17.9897 acres when the shareholder resolution authorized the sale of only 16 acres, breached the contract's representations that Acacia had authority to sell the land and grant the easements.

Cross-claim count three[7]: Negligence and Negligent Misrepresentations<br>and<br>Cross-claim count six: Equitable Estoppel

{¶26} ADC claims that Acacia negligently (count three) or misleadingly (count six) represented that it had the authorization of its shareholders to sell the property and grant the easements when it did not, and that ADC relied on that representation to its detriment in the amount of the money paid for the land and additional money spent to develop the project.

Cross-claim count four: Rescission

{¶27} Like the other cross-claims, the claim for rescission is based on the assertion that Acacia never had the shareholders' authority to enter into the contract in the first place. This claim alleges alternatively that the contract should be rescinded because either both ADC and Acacia were mistaken, or Acacia only was mistaken, about whether Acacia had shareholder

---

[7] Count two of the cross-claim — breach of joint venture agreement — is no longer pending. See footnote 4.

authority to sell the property. Like the other counts, the mistake claims are based on the alleged violation of the shareholder resolution.

Cross-claim count five: Unjust Enrichment

**{¶28}** Here ADC claims that Acacia never transferred the land because it didn't have the authority to do so, and that ADC has conferred a benefit on Acacia by spending over $10 million to improve land that actually belongs to Acacia.

Cross-claim count seven: Declaratory Judgment

**{¶29}** In its last cross-claim ADC seeks a declaration of the rights and obligations of the parties to the real estate purchase agreement. ADC has detailed at page 2 of its November 18, 2009 motion for summary judgment the declaratory relief it seeks as follows: that Acacia did not have authority to enter into the purchase agreement, grant the easements, and grant the property by deed; that Acacia did not execute the contract, the easement or the deed according to its code of regulations; that Acacia did not deliver marketable title to ADC; that Acacia did not deliver the easements to ADC; that ADC effectively rescinded the deal; and that Acacia's January 2009 ratification was invalid.

Acacia's shareholder ratification

**{¶30}** Because Carr's and ADC's claims in case number 635329 were all grounded in the allegation that Acacia's board exceeded the shareholders' authority under the resolution for the sale of 16 acres, with no explicit mention of the scenic and other easements, a subsequent board scheduled a shareholder vote to ratify the purchase and easement agreements. The shareholders were notified of the proposed resolution by a notice dated December 29, 2008, and a vote was taken on January 28, 2009. The resolution provided, in pertinent part, that the shareholders:

"hereby ratify and approve all of the actions of . . .the Board of Directors . . .relative to the negotiation, sale and transfer of approximately 17.9919 acres of land" and "the terms and conditions set forth in the First Amended and Restated Purchase and Sale Agreement and Easement Agreement dated August 19, 2005, granting the scenic easement/buffer zone in favor of Acacia Development Company, Ltd."

{¶31} The resolution passed with the approval of 81% of the outstanding shares of record entitled to vote.

## LAW AND ANALYSIS

{¶32} All of ADC's claims in both cases are premised on the claim that because the board of directors did not comply with the corporate code of regulations, Acacia never had authority to enter into the contract, grant the land, and grant the easements. The court is considering these claims first in the context of Acacia's motions for summary judgment, so the evidence must be construed most strongly in ADC's favor.[8] In connection with Acacia's motion on ADC's claims, then, the court assumes, first, that the board needed, and did not have, explicit shareholder approval to sell 17.9897 acres of land and to grant the scenic and other easements and, second, that the instruments of transfer were not signed by both the board president and secretary as required by Article III of Acacia's code of regulations.

{¶33} Corporations in Ohio may purchase, sell or encumber property and may make contracts.[9] Sections 1702.10 and 1702.11[10] of the Ohio Revised Code provide that a non-profit corporation *may* adopt "regulations for the government of the corporation, the conduct of its affairs, and the management of its property, consistent with law" and the articles of

---

[8] See Rule 56(C) of the Ohio Rules of Civil Procedure.

[9] R.C. 1702.12(F) pertaining to non-profits and 1701.13(F) pertaining to for-profit corporations.

[10] All the parties agree that Acacia is a non-profit corporation, hence the references in this entry to Chapter 1702. However, even if the general corporation law of Chapter 1701 applies to

incorporation. If regulations are adopted, they may include provisions with respect to "defining, limiting, or regulating the exercise of the authority of the corporation, the directors, the officers, the members, or any class of members." Acacia did adopt a code of regulations, the relevant provisions of which are excerpted above and which arguably prescribed shareholder approval as the condition necessary before the company could exercise its statutory authority to sell or encumber land.[11]

{¶34} But Acacia's failure to abide by those regulations does not create a cause of action in favor of ADC, or in Acacia's favor against ADC. A corporation's code of regulations establishes the procedural rules that govern the relationships among the corporate shareholders, directors and officers. Shareholders delegate the management of the company to a board of directors but may reserve control over certain executive decisions through the code of regulations. The regulations have the force of contracts between the corporation and its shareholders.[12] As such, only an aggrieved shareholder — either derivatively or individually, depending on the injury — may base a cause of action against the directors on a violation of the code of regulations, but a non-shareholder, like ADC, who is not bound by[13] the code of regulations cannot enforce them against the corporation, and Acacia cannot enforce them against

---

Acacia, its provisions are substantially the same.

[11] The code of regulations, as excerpted above, provides that the board may "sell or trade minor portions of the company *property*" but is silent on whether a shareholder resolution is required to do so. However, the code also provides that the board "shall not have power to mortgage or voluntarily encumber any *real property*" without specific shareholder approval. Because a sale is not the same as an encumbrance (see footnote 22 below), and because the regulations are silent about the need for shareholder approval of the sale of *real property*, a question of fact exists about whether Acacia ever needed a shareholder resolution to sell the land. Nevertheless, in considering Acacia's motion for summary judgment the court will assume shareholder approval of a land sale is required.

[12] *Knight v. Shutz* (1943), 141 Ohio St. 267, at syllabus 8.

[13] Or even aware of the code of regulations. See R.C. 1702.11(F): No person dealing with

a third-party like ADC. Toward that end, §1702.12(I)[14] of the Revised Code limits the classes of litigants who have standing to claim that a corporation exceeded its authority:

> No lack of, or limitation upon, the authority of a corporation shall be asserted in any action except as follows:
>
> (a) By the state in an action by it against the corporation;
>
> (b) By or on behalf of the corporation against a director, an officer, or a member as such;
>
> (c) By a member as such or by or on behalf of the members against the corporation, a director, an officer, or a member as such.

{¶35} So, while Carr, as a shareholder, had standing to assert a claim for damages against Acacia's directors for having sold and encumbered the real estate without proper shareholder approval, ADC, a non-shareholder, could not make that same claim because ADC is not a party to the code of regulations. At the same time, if for some reason either Acacia or its shareholders wanted to avoid Acacia's obligations under the contract with ADC they could not do so based on a claim of lack of shareholder authorization under the code of regulations. The notion of allowing the shareholders to attack the directors for their failure to abide by the code of regulations is consistent not only with the regulations being a contract between the board and the shareholder, but also with the stockholders entrusting the management of the corporation's affairs to the board of directors. On one hand, no corporation could be managed if every decision had to be submitted to the shareholders for approval. On the other hand, no third party would contract with a corporation without assurance that the corporation couldn't purposely forgo shareholder approval to enter into a voidable contract.

---

the corporation shall be charged with constructive notice of the regulations.

[14] 1701.13(H) if Acacia is not non-profit.

**{¶36}** Where the directors don't follow the code of regulations when entering into a contract they might have to answer to the shareholders, but neither the corporation nor the other contracting party can negate the contract on the same grounds.

**{¶37}** Since Acacia's breach of the code of regulations cannot itself form the basis for a cause of action in favor of Acacia Development Co., LLC, ADC asserts that Acacia breached its warranty in the contract that it had "full power, authority and legal right to enter into" the contract. The elements ADC must prove on a breach of contract claim are (1) the existence of a contract, (2) that ADC fulfilled its obligations, (3) that Acacia failed to fulfill its obligations, and (4) that damages resulted from Acacia's failure.[15] ADC's ability to recover on this claim depends first on what the parties intended by including Acacia's representation that it had the authority to enter into the contract.

**{¶38}** The interpretation of a written contract is a matter of law for the court.[16] Courts presume that the parties expressed their intentions in the language they chose to employ in the contract.[17] If a contract is clear and unambiguous, there is no issue of fact to be determined.[18] The context of a particular provision may also be considered when deciding its meaning. In this case, the representation at issue appears in a separate section captioned "Seller's Representations and Warranties." The section has three paragraphs, labeled A, B, and C. Paragraph A contains the representation that the seller, Acacia, "is a corporation duly organized and validly existing under the laws of the State of Ohio" and that Acacia "and the party signing this agreement" on

---

[15] See, *e.g.*, *Lawrence v. Lorain Cty. Community College* (1998), 127 Ohio App. 3d 546, 548-49.

[16] *Alexander v. Buckeye Pipeline Co.* (1978), 53 Ohio St.3d 241, syllabus at ¶ 1.

[17] *Kelly v. Med. Life Ins. Co.* (1987), 31 Ohio St.3d 130, at syllabus 1.

[18] *Inland Refuse Transfer Co. v. Browning-Ferris Ind. of Ohio, Inc.* (1984), 15 Ohio St.3d 321, 322.

Acacia's behalf (the board president) "have full power, authority and legal right to enter into this Agreement." Paragraph C includes the representation that by entering into the contract Acacia will not be violating any "other agreement" to which it is a party.

{¶39} "Full power, authority and legal right" is the kind of ungainly language that frustrates courts.[19] Did the parties choose this language because they meant three different things by "full power," "authority" and "legal right?" Or, like "free and clear" in *Kohlbrand*, is it flaccid writing of the sort endemic to legal documents? Given that the contract is more than 15 single-spaced pages, it seems improbable that the parties chose these three terms with particular care to encompass three different concepts; more likely is that it is form language that has found its way into one contract after the next over many years. Yet, this provision cannot be said to unambiguously include or exclude a representation by Acacia that it had authority under its code of regulations to sell the property and grant the easements. In Acacia's favor, *shareholder* authority to enter into the contract is never explicitly mentioned, and there is no express language that the contract will not be made in violation of Acacia's *code of regulations*. These omissions suggest that ADC was only concerned with Acacia being a corporation in good standing and that it had not otherwise encumbered the property. However, the representations

---

[19] See, for example, *Kohlbrand v. Ranieri,* 159 Ohio App. 3d 140, 2005-Ohio-295*,* ¶¶ 15-17, where the court offered the following on the subject of a contract that used the term "free and clear":

*Free* and **clear** mean the same thing. Using both is an unnecessary lawyerism. *Free* is English; *clear* is from the Old French *cler.* After the Norman Conquest, English courts were held in French. The Normans were originally Vikings, but after they conquered the region of Normandy, they became French; then they took over England. But most people in England, surprisingly enough, still spoke English. So lawyers started using two words for one and forgot to stop for the last 900 years.

So *free* and *clear* do not mean separate things; they mean, and were always meant to mean, *exactly the same thing.* Just as *null* and *void* and *due* and *payable* mean the same thing. All of these couplets are redundant and irritating lawyerisms. And they invite just what has happened here — an assertion that they somehow have different meanings.

that Acacia had "authority" and was not breaching any "other agreement" can be read to include a promise that it had satisfied its code of regulations — *i.e.*, Acacia's agreement with its shareholders that it would get their authority through a resolution before selling or encumbering land. The court must indulge, on a motion for summary judgment, a construction that favors ADC and there is therefore an issue of fact about what the parties intended by including this language in the contract. Because of that, and assuming for now, and for the purpose of considering summary judgment, that Acacia did not properly obtain shareholder approval, then there is necessarily an issue of fact about whether Acacia breached the contract.

{¶40} That leaves for consideration only the question of whether Acacia's breach proximately caused damage to ADC. Proximate cause includes a failure to act — in this case, the failure to obtain shareholder approval of the property sale and easements — which directly produces the damage and without which it would not have occurred. The damage claimed by ADC is a cloud on the title that made it unmarketable. While acknowledging that proximate cause is ordinarily a question of fact for a jury to decide,[20] there is no evidence here that a cloud on the title ever existed and, even if it did, it was not caused by Acacia's failure to abide by the code of regulations but by Carr's conduct, including his lawsuit.

{¶41} At Section 3 of the contract, Acacia agreed to "convey good and marketable, indefeasible fee simple title" to the property "free and clear" of "encumbrances" and "clouds on title" except for six permitted exceptions, none of which are relevant here. The Ohio Supreme

---

The Norman Conquest was in 1066. We can safely eliminate the couplets now.

[20] See, *e.g.*, *Strother v. Hutchinson* (1981), 67 Ohio St.2d 282, 288.

Court has described *marketable title* as that which "imports such ownership as insures to the owner the peaceable enjoyment and control of the land as against all others."[21]   Furthermore:

It has also been defined as one which is sufficient to support or defend an action of ejectment. It should show a full and perfect right of possession in the vendor. It should appear reasonably certain that *the title* will not be called in question in the future, so as to subject the purchaser to the hazard of litigation with reference thereto. It must in any event embrace the entire estate or interest sold, and that free from the lien of all burdens, charges, or incumbrances which present doubtful questions of law or fact.[22]

**{¶42}** Marketable in this context does not mean the same thing as salable, as ADC and its expert witnesses argue.  Instead, marketable means the *title* to the property is not subject to a claim that could result in the property holder being dispossessed.  Even though the notoriety of Carr's lawsuit may have made it difficult to find buyers for the property, *i.e.*, less salable, the lawsuit is not a claim to the property's title.  There is no evidence in this case that Acacia possessed and conveyed anything other than a marketable title.  Acacia had "a full and perfect right of possession" of the property it sold, and there are no encumbrances[23] on the title other than the listed exceptions.

**{¶43}** Acacia is a corporation with the power to sell its own real estate.  Once the contract was performed, Acacia and ADC were bound, despite whether Acacia failed to follow its own code of regulations.  That failure may have subjected Acacia to Carr's lawsuit, but it did not encumber the real property because title had transferred well before the suit, so the litigation

---

[21] *McCarty v.Lingham* (1924), 111 Ohio St. 551, 553.

[22] *Id.*, at 558.   Emphasis in italics added.

[23] An encumbrance means "[a]ny right to, or interest in, land which may subsist in another to diminution of its value, but consistent with the passing of the fee by conveyance. * * * A claim, lien, charge, or liability *attached to and binding* real property; e.g. a mortgage; judgment lien; mechanics lien; lease; security interest; easement or right of way; accrued and unpaid taxes. If the liability relates to a particular asset, the asset is encumbered." *Dietl v. Sipka*, 185 Ohio App.3d 218,

was never a "hazard" with reference to ADC's *title*. The lawsuit sought money damages only and, for whatever its deficiencies, correctly never sought the restitution to Acacia of the real property or a declaration that the real estate transfer and easements were invalid as a matter of law because those remedies were never available in a shareholders' derivative suit once the deed and money were exchanged. Title passed when ADC paid the contract price. Carr and the other shareholders' only remedy after that for the alleged violation of the code of regulations and breach of fiduciary duty was a derivative claim on behalf of the corporation for money damages against the directors for impairing the value of the company. There were no circumstances under which Carr's suit could have dispossessed ADC of the property. This is true even though ADC was named as a defendant.[24] At the very worst, the lawsuit represented a potential *future* judgment lien against ADC that, if not satisfied, would encumber its *own* title, but it certainly never interfered with ADC's "full and perfect right of possession."

{¶44} Nor did Acacia's alleged lack of shareholder authority constitute a cloud on the title. Like "marketable," the term "cloud on title" has a specific legal meaning and that meaning doesn't encompass ADC's practical difficulty in finding buyers once Carr made his allegations and filed a lawsuit. A cloud on title has been defined as a title or encumbrance apparently valid, but in truth invalid.[25] ADC's comparison to a married grantor passing title without releasing a spouse's dower rights is an example of a cloud on title — because dower is an interest in land — but is not analogous to what happened here since the shareholders never had an interest in the

---

2009-Ohio-6225, at ¶ 14.

[24] Even after repeated readings of the 10/09/2007 first amended verified complaint in case number 635329, the court cannot discern any cause of action at all alleged against Acacia Development Co., LLC, much less a claim that would have withstood a motion to dismiss.

[25] *Fortune Megatronics of Ohio, Inc. v. Risen* (May 18, 1989), 10th Dist. App. No. 88AP-954, WL 1989 52952, unreported.

land.  There is no question that Acacia's conveyance of the property and easement were *intra vires* vis-à-vis ADC and were thus valid even if they were done without a fully compliant shareholder resolution according to Acacia's code of regulations.  As a corporation, Acacia had the legal ability to own and convey real estate.  As already discussed, any breach of the code of regulations is actionable only by the shareholders against the corporation — not by ADC against Acacia or Acacia against ADC — and would not invalidate the deeds.  The transfer would be invalid only if it were *ultra vires* in the truest sense: that is, a corporate act beyond the statutory and charter powers of the corporation.[26]  But the notion of *ultra vires* acts by a corporation does not encompass a corporation's violation of its own regulations or bylaws.[27]

{¶45} Because Acacia transferred a marketable title with no clouds, ADC was not harmed by any breach by Acacia of the contract warranty that it had specific shareholder authority to sell the land and grant the easements, and summary judgment in Acacia's favor is appropriate on count one of ADC's cross-claim in case number 635329.

{¶46} In count three of the cross-claim, ADC alleges that Acacia owed it a duty "to investigate and fully, properly, and accurately represent its authority"[28] to ADC, and that Acacia negligently represented that it had the authority to enter into the transaction.  This is essentially the same claim for breach of contract in count one, and summary judgment is appropriate in Acacia's favor for all the reasons given above and the additional reason that it is not a tort to breach a contractual duty.

---

[26] Ohio Jurisprudence, Third Edition, Business Relationships, Section 313.
[27] *Id.*
[28] Cross-claim, page 34, ¶ 97.

{¶47} Count four of the cross-claim is for rescission. Rescission is not a separate cause of action, but an equitable remedy.[29] ADC claims the right to this remedy because of Acacia's conduct in counts one and three of the cross-claim. Summary judgment has been granted on those claims and a remedy for them is moot. ADC also claims the right to rescission because either the parties to the land purchase agreement were mutually mistaken, or Acacia was unilaterally mistaken, about whether Acacia had the legal right to enter into the contract. As discussed above, Acacia had the legal right to enter into the contract, and the deeds granting the land and the easements are unassailable by third parties (*e.g.*, shareholders) even though, if Carr's allegations had merit, the directors might have to answer to the shareholders for selling and encumbering the land without specific shareholder approval. As a result, there was no mistake about Acacia's legal right to perform under the contract and the remedy of rescission is moot.

{¶48} Count five of the cross-claim is for unjust enrichment. ADC claims that because Acacia did not have shareholder approval it was "unable to make the conveyances of real property"[30] so that Acacia actually still owns the land and has been unjustly enriched by ADC's improvements to the land. Summary judgment in Acacia's favor on this claim is appropriate for the reason already decided above, namely that ADC has received good title to the property and now owns the land, not Acacia.

{¶49} Count six of the cross-claim is captioned as a claim for equitable estoppel. Equitable estoppel requires ADC to prove four elements: (1) that Acacia made a factual misrepresentation, (2) that the misrepresentation was misleading, (3) that the misrepresentation induced actual reliance, which was reasonable and in good faith, and (4) that ADC suffered

---

[29] *J.A. Industries, Inc. v. All Am. Plastics, Inc.* (1999), 133 Ohio App.3d 76, 83.
[30] Cross-claim, page 36, ¶ 112.

detriment due to the reliance.[31]   Summary judgment in Acacia's favor is appropriate for the same reasons as counts one and three of the cross-claim.

{¶50} Count seven of the cross-claim in case number 635329, and count one (the only count) of ADC's intervenor's cross-claim in case number 682363, are for declaratory judgment. In case number 635329, ADC simply asserts that "a controversy exists between the parties as to the conveyances via the contract" and that "the parties are entitled to a declaration from the court as to the meaning, effect and validity of the contract and the conveyances within the contract."[32] The cross-claim in case number 682363 is more expansive about the relief sought.   There, ADC alleged that Acacia never had the authority to convey the land or the easements and that the January 2009 ratification had no effect because by then ADC had rescinded the transaction. ADC asks that the court declare: a) that the real estate transactions and contracts between ADC and Acacia have been breached; b) that the real estate transactions and contracts between ADC and Acacia have been rescinded; and c) that the resolution and the purported ratification of the real estate transactions and contracts are void.[33]

{¶51} The court has found that Acacia lawfully sold the land and granted the easements to ADC even if it did so without strictly complying with its own code of regulations.   The evidence also shows that each party to the August 19, 2005 first amended and restated agreement of purchase and sale has performed all of its other duties and obligations under the contract.   No genuine issue of material fact remains and summary judgment in Acacia's favor on the claims for declaratory judgment is appropriate.   The court therefore declares: that the August 19, 2005 contract is enforceable; that each party has performed its duties and obligations under the

---

[31] *Currier v. Penn-Ohio Logistics*, 186 Ohio App.3d 249, 2010-Ohio-195, ¶ 33.
[32] Cross-claim, page 37, ¶¶ 122 and 123.

contract; that the limited warranty deed from Acacia Country Club to Acacia Development Co., Ltd., dated August 19, 2005 and first recorded as instrument number 2005 08 22 1094 in the records of the Cuyahoga County Recorder transferred marketable, unclouded title to the property; and that the easement agreement acknowledged August 19, 2005 and recorded as instrument number 2005 10 20 0913 in the records of the Cuyahoga County Recorder is effective and binding on the parties.

## CONCLUSION

{¶52} For the reasons given, Acacia's motions for summary judgment in case numbers 635329 and 682363 on Acacia Development Company, LLC's cross-claims are granted, and ADC's motions for summary judgment against Acacia in those cases are denied.

{¶53} Summary judgment in the defendants' favor on the complaint in case number 635329 was previously granted. That leaves Aveni's and ADC's counterclaims against Carr and Aveni's cross-claim against Acacia for indemnity (with intervenor Westfield's stayed declaratory judgment claim) as pending affirmative claims in 635329. No claims remain pending for adjudication in 682363. Because all of the court's decisions in 682363 are ripe for appeal, the court finds as to both cases, and pursuant to Civil Rule 54(B), that there is no just cause for delay in 635329 and 682363.

{¶54} IT IS SO ORDERED:

Date:  [April 1, 2011]

JUDGE JOHN P. O'DONNELL

---

[33] Intervenor's cross-claim in 682363, page 9.